```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------X
HINDS COUNTY, MISSISSIPPI,          :
                                    :
                    Plaintiff,      :
                                    :
     - against -                    :
                                    :   08 Civ. 2516
                                    :
WACHOVIA BANK N.A. et al.,          :
                                    :
                    Defendants.     :
-----------------------------------X
IN RE MUNICIPAL DERIVATIVES         :
ANTITRUST LITIGATION                :   08 MDL No. 1950
                                    :
THIS DOCUMENT RELATES TO:           :   **DECISION AND ORDER**
ALL ACTIONS                         :
-----------------------------------X
```

**VICTOR MARRERO, United States District Judge.**

This action is the lead case in the consolidated pretrial proceedings of the multidistrict litigation In re Municipal Derivatives Antitrust Litigation, 08 MDL No. 1950. Plaintiffs are municipalities and other purchasers of municipal derivatives (collectively, "Plaintiffs"). Plaintiffs first brought this action on August 22, 2009, claiming that more than forty corporate defendants and others (collectively, "Original Defendants") illegally rigged bids, limited competition, and fixed prices in the municipal derivatives market, in violation of § 1 of the Sherman Antitrust Act, 15 U.S.C. § 1 ("§ 1"). All Original Defendants except three moved to dismiss the consolidated amended complaint pursuant to Rule 12 (b)(6) of the Federal Rules of Civil Procedure ("Rule 12(b)(6)"). By Decision and Order dated April 29, 2009

(the "April 2009 Decision"),[1] the Court granted the Original Defendants' motion with leave to replead, affording Plaintiffs a chance to file a second amended complaint.

Plaintiffs filed a second consolidated class action complaint ("SCAC") on June 18, 2009, again alleging a conspiracy among sixteen corporate defendants and certain co-conspirators to fix, maintain or stabilize the price of, allocate customers and markets for, and rig the bids for municipal derivatives sold in the United States and its territories in violation of § 1.  Fifteen of the remaining Original Defendants now move to dismiss the SCAC pursuant to Rule 12(b)(6).  For the reasons set forth below, the motion is DENIED.

## I. BACKGROUND

A.   PROCEDURAL BACKGROUND

1.   Multidistrict litigation

In January 2007, Bank of America, N.A. ("BoA") entered into the antitrust corporate leniency program administered by the Department of Justice, Antitrust Division ("DOJ Antitrust") under the Antitrust Criminal Penalty Enhancement and Reform Act of 2004 ("ACPERA").  See Antitrust Criminal Penalty Enhancement and Reform Act of 2004, Pub. L. No. 108-

---

[1]  The April 2009 Decision is available at Hinds County v. Wachovia Bank N.A., 620 F. Supp. 2d 499 (S.D.N.Y. 2009).

237, tit. II, §§ 201-221, 118 Stat. 661, 665-669.  Multiple civil antitrust actions against various defendants were subsequently filed by various municipalities and other entities across the country.  Pursuant to 28 U.S.C. § 1407, the Judicial Panel on Multidistrict Litigation ("MDL") transferred all pending and subsequent related actions to this District on June 16, 2008, and ordered that they be assigned to this Court for coordinated or consolidated pretrial proceedings.  In accordance with the MDL Order, fifteen cases were ultimately transferred and consolidated with the designated lead case.

The original consolidated class action complaint ("CAC") was filed on August 22, 2008 against more than forty corporate defendants.[2]  The CAC alleged that Original Defendants

---

[2] The defendants as named in the CAC were: BoA; Wachovia Bank N.A. ("Wachovia"); AIG Financial Products Corp. ("AIG"); Bear, Stearns & Co., Inc. ("Bear Stearns"); Financial Security Assurance Holdings, Ltd. ("Financial Security Holdings"); Financial Security Assurance, Inc. ("Financial Security Assurance"); Financial Guaranty Insurance Co. LLC ("Financial Guaranty"); GE Funding Capital Market Services, Inc. ("GE"); Genworth Financial Investment Management, LLC ("Genworth"); Feld Winters Financial LLC ("Feld Winters"); Natixis S.A. ("Natixis"); JP Morgan Chase & Co. ("JP Morgan"); Piper Jaffray & Co. ("Piper Jaffray"); Société Générale SA ("Société Générale"); AIG SunAmerica Life Assurance Co. ("AIG SunAmerica"); UBS AG ("UBS"); XL Capital, Ltd. ("XL Capital"); XL Asset Funding Co. I, LLC ("XL Funding"); XL Life Insurance & Annuity Inc. ("XL Life"); Merrill Lynch & Co., Inc. ("Merrill Lynch"); Morgan Stanley; National Westminster Bank PLC ("NatWest"); Natixis Funding Corp ("Natixis Funding"); Investment Management Advisory Group, Inc. ("Investment Management Advisory"); CDR Financial Products ("CDR"); Winters & Co. Advisors, LLC ("Winters & Co."); First Southwest Company ("First Southwest"); George K. Baum & Co. ("Baum"); Kinsell Newcomb & De Dios Inc. ("Kinsell Newcomb"); PackerKiss Securities, Inc. ("PackerKiss"); Shockley Financial Corp. ("Shockley"); Sound Capital Management, Inc. ("Sound Capital"); Cain Brothers & Co., LLC ("Cain Brothers"); Morgan Keegan & Co., Inc. ("Morgan Keegan"); Trinity Funding Co. LLC ("Trinity Funding"); and Municipal Government Investors Corp. ("MGIC").

conspired to fix, maintain or stabilize the price of, and to rig bids and allocate customers and markets for, municipal derivatives in violation of § 1.  All Original Defendants named in the CAC except for BoA, Feld Winters and MGIC filed a joint motion to dismiss the CAC.  The Court's April 2009 Decision granted Original Defendants' joint motion with leave to replead.

Plaintiffs filed the SCAC in this action on June 18, 2009, again alleging a § 1 claim against sixteen corporate defendants.  Plaintiffs the City of Baltimore, Maryland ("Baltimore"), the University of Mississippi Medical Center, the University of Southern Mississippi, the Mississippi Department of Transportation, the University of Mississippi (collectively, the "Mississippi Plaintiffs"), the Bucks County Water & Sewer Authority ("Bucks County"), and the Central Bucks School District (together with Baltimore, the Mississippi Plaintiffs, and Bucks County, "Named Plaintiffs")[3] purport to represent a class (the "Class") consisting of:

> All state, local and municipal government entities, independent government agencies and private entities that purchased by competitive bidding or auction [m]unicipal [d]erivatives directly from a [p]rovider [d]efendant, at any time from January 1, 1992 through the present in the United States and its territories or for delivery in the United States and its territories.

---

[3]  Fairfax County, Virginia, a named plaintiff in the CAC, is not named in the SCAC.

(SCAC ¶ 183.)  Defendants as named in the SCAC are: BoA; Bear Stearns; JP Morgan; Morgan Stanley; NatWest; Piper Jaffray; Société Générale; UBS; Wachovia; Wells Fargo; Natixis; Investment Management Advisory; CDR; Winters & Co.; Baum; and Sound Capital (collectively, "Named Defendants").

All Named Defendants except BoA (collectively, "Defendants") filed a joint motion to dismiss the SCAC, dated September 18, 2009 (the "Joint Motion"), accompanied by a memorandum of law in support.  In addition, Natixis, Société Générale, Morgan Stanley, JP Morgan, NatWest, and Baum filed supplemental memoranda of law, also dated September 18, 2009 (collectively, the "Supplemental Memoranda"), arguing for dismissal of the specific claims brought against each of them in the SCAC.  Named Plaintiffs filed a memorandum of law in opposition to the Joint Motion, as well as memoranda in opposition to each of the Supplemental Memoranda.

    2.  The April 2009 Decision

The April 2009 Decision granted Original Defendants' motion to dismiss the CAC with leave to replead. The Court found that Plaintiffs had alleged a plausible conspiracy arising out of specific allegations against certain Original Defendants, but had failed to allege a sufficient factual connection between other Original Defendants and the alleged conspiracy.  The Court found that Plaintiffs had failed to

make a specific allegation of involvement in the alleged conspiracy –- and thus granted the motion to dismiss —- as to the following Original Defendants: AIG; Financial Security Holdings; Financial Security Assurance; Financial Guaranty; GE; Genworth; AIG SunAmerica; UBS; XL Capital; XL Funding; XL Life; Merrill Lynch; Morgan Stanley; NatWest; Investment Management Advisory; First Southwest; Kinsell Newcomb; Shockley; Cain Brothers; Morgan Keegan; and Trinity Funding. The Court, however, found that the CAC did make specific and plausible allegations that the following Original Defendants received, paid, or were involved in kickbacks in connection with the sale of municipal derivatives: CDR; JP Morgan; Bear Stearns; Baum; Natixis; Piper Jaffray; and Winters (collectively, the "Surviving Defendants").

Nonetheless, the Court dismissed the claims against the Surviving Defendants because they were based upon events that occurred outside of the applicable statute of limitations period. The Court found that the CAC had failed to plead fraudulent concealment so as to toll the statute of limitations. The CAC alleged, in pertinent part, that the "Plaintiffs and Class Members did not discover, nor could have discovered through reasonable diligence, that [Original] Defendants and their co-conspirators were violating the antitrust laws until shortly before this litigation was

commenced, because Defendants and their co-conspirators used deceptive and secret methods to avoid detection and affirmatively conceal their violations." (CAC ¶ 146.) The Court found that the CAC failed to plead fraudulent concealment with the particularity required by Rule 9(b) of the Federal Rules of Civil Procedure ("Rule 9(b)"). Specifically, the Court found that the CAC failed to plead the second and third prongs of fraudulent concealment -- continuing ignorance of the violation until sometime within the four-year antitrust statute of limitations and due diligence in pursuing discovery of the claim -- with the particularity required by Rule 9(b). See Hinds, 620 F. Supp. 2d at 521-22 (citing Fed. R. Civ. P. 9(b)). With respect to the due diligence prong, the Court found that "a brief reference to reasonable diligence, coupled with general allegations of secrecy and deception" did not satisfy the plaintiffs' burden under Rule 9(b). See Hinds, 620 F. Supp. 2d at 522.

B.  FACTUAL ALLEGATIONS[4]

The facts of this case are set forth in the April 2009 Decision, familiarity with which is assumed. Here, the Court

---

[4] The facts below are taken from the SCAC, which the Court accepts as true for the purpose of ruling on a motion to dismiss. See Spool v. World Child Int'l Adoption Agency, 520 F.3d 178, 180 (2d Cir. 2008) (citing GICC Capital Corp. v. Technology Fin. Group, Inc., 67 F.3d 463, 465 (2d Cir. 1995)).

will briefly review facts most relevant to the § 1 claim as amended.

      1.  <u>Conduct Alleged</u>

This action involves allegations of a conspiracy "to fix, maintain or stabilize the price of, and to rig bids and allocate customers and markets for" municipal derivatives sold in the United States and its territories. (SCAC ¶ 1.) The SCAC defines municipal derivatives as the investment instruments used by issuers of, or those who receive money from the issuance of, municipal bonds, which are bonds issued by states, cities, counties, or their agencies, as well as by tax-exempt, non-profit private entities. Municipal derivatives, as defined in the SCAC, include investment instruments relating to the investment of bond proceeds or a bond's underlying interest rate obligations. Municipal derivatives involving bond proceeds include Guaranteed Investment Contracts ("GICs"), such as forward purchase, supply or delivery agreements, and repurchase agreements, as well as certificates of deposit on escrow agreements. And municipal derivatives involving the bond's underlying interest rate obligations include "Swaps, Options, Swaptions, Collars and Floors." (<u>Id.</u> ¶ 67.)

The SCAC, like the CAC, alleges that Named Defendants combined and conspired to allocate customers and fix and

-8-

stabilize the prices of municipal derivatives, including the interest rates paid to issuers on such derivatives.  The SCAC alleges that individuals employed by Named Defendants knowingly acted as conduits for communication of pricing and bidding information among Named Defendants, with the knowledge and consent of Named Defendants.  Further, Named Plaintiffs allege that Named Defendants shared profits from winning bids, provided secret compensation to losing bidders and paid kickbacks to co-conspirators.

Building on allegations in the CAC, the SCAC cites numerous additional transactions that allegedly involved bid-rigging, kickbacks and collusive pricing among Named Defendants.  Named Plaintiffs rely largely on information obtained from BoA "in the context of a settlement process," (id. ¶ 2), as well as information provided by a confidential witness formerly employed by BoA's municipal derivatives desk who is cooperating with the DOJ in its antitrust investigation (the "Confidential Witness").  Specifically, the SCAC alleges collusive conduct by thirty-seven individuals employed by Named Defendants during the relevant class period.  The SCAC describes various communications and meetings that took place in which employees of Named Defendants would arrange which co-conspirators would enter sham bids and which co-conspirator would enter the winning bid.  The prearranged auctions and

transactions were then orchestrated through sham and courtesy bids entered by Named Defendants and co-conspirators.

For example, the SCAC alleges numerous collusive transactions that were brokered through Investment Management Advisory, a Named Defendant, that have been identified through audiotapes, the Confidential Witness and emails.  The SCAC alleges numerous communications between the Confidential Witness and Martin Stallone ("Stallone"), the managing director of Investment Management Advisory, describing the coordination of bids among numerous Named Defendants, including CDC, CDR, Piper Jaffray, JP Morgan and Sound Capital.  Stallone would allegedly provide information to the Confidential Witness about competing bids, and the Confidential Witness purportedly used code language to indicate when BoA wanted to be the prearranged winning bidder on a deal.

The SCAC also alleges collusive trades that were brokered through CDR, Sound Capital or Baum, and involved BoA, UBS, JP Morgan, Kinsell, PackerKiss, Wachovia and Lehman Brothers, Inc. ("Lehman").  The SCAC lists several transactions for which CDR, Sound Capital or Baum coordinated the bidding and pricing terms, and alleges that there are audiotapes of discussions between Named Defendants' employees coordinating the pricing terms and timing of both sham and winning bids.

As an example, on one occasion, CDR allegedly told BoA what bid it should enter to win a particular deal.

The SCAC also alleges collusive practices involving negotiated transactions.  For example, the SCAC alleges that in a July 2004 transaction involving a swap agreement for a wastewater facility for the City of Chicago ("Chicago Swap"), BoA and JP Morgan were given the opportunity to see Lehman's pricing and adjust their own pricing accordingly, so that Lehman got 60% of the deal and JP Morgan and BoA each got 20%.

    2.  Related investigations

    Named Plaintiffs also rely on publicly-available information gathered in the Internal Revenue Service ("IRS") and DOJ investigations into the municipal derivatives industry.

    For example, the SCAC alleges that, as part of a settlement with the IRS, it was disclosed that Baum was involved in "many collusive Municipal Derivative deals" and "found evidence of bid rigging in these deals." (Id. ¶ 134.) The SCAC describes six deals for which Samuel Gruer, purportedly a former vice president of JP Morgan's tax-exempt capital markets group, submitted sham courtesy bids to Baum. CDC won all six of the deals described and the IRS allegedly found that, for one of the deals, CDC paid a "large fee"

directly into the personal account of David Lail, an employee in Baum's municipal derivatives department.  (Id.)

        Named Plaintiffs also point to DOJ Antitrust's ongoing investigation into the municipal derivatives industry.  On November 15, 2006, the Federal Bureau of Investigation ("FBI") allegedly raided the offices of and seized documents from CDR, Investment Management Advisory, and Sound Capital.  And on December 11, 2006, DOJ Antitrust brought their case to a federal grand jury sitting in the Southern District of New York.  The Court takes judicial notice of the indictment returned by the grand jury on October 29, 2009 against CDR and CDR employees for criminal antitrust violations in the municipal derivatives industry.  See Indictment, United States v. Rubin/Chambers, Dunhill Insurance Services, Inc. et al., 09 Cr. 1058 (S.D.N.Y. Oct. 29, 2009).

        Lastly, the SCAC cites the investigations of the California, Connecticut and Florida attorneys general "into antitrust violations with respect to the municipal derivatives market." (Id. ¶ 174.)  The SCAC claims that a total of thirty-eight corporate entities have received investigative requests from state attorneys general, including BoA, JP Morgan, Piper Jaffray, Société Générale, UBS, Wachovia, NatWest, CDC, CDR, Winters, and Baum.

### 3.   Allegations of Fraudulent Concealment

The SCAC reiterates many of the allegations of the CAC, including those regarding secret meetings, evading audiotaping, and intentionally creating the false appearance of competition.  The SCAC also reasserts that "Plaintiffs and Class members did not discover, nor could have discovered through reasonable diligence, that [Named] Defendants and their co-conspirators were violating the antitrust laws until shortly before this litigation was initially commenced, because [Named] Defendants and their co-conspirators used deceptive and secret methods to avoid detection and to affirmatively conceal their violations." (Id. ¶ 203; see also CAC ¶ 146.)

To bolster the allegations of the CAC, the SCAC further alleges that Named Plaintiffs or Class members had "no knowledge of the combination and conspiracy alleged herein, or of any facts that might have led to the discovery thereof in the exercise of reasonable diligence prior to BoA's announcement of cooperation with [DOJ Antitrust] and the subsequent discussions with BoA, which revealed the scope of the claimed conspiracy." (SCAC ¶ 199.)  In addition, the SCAC cites various procedural safeguards employed by Named Plaintiffs and Class members as bond issuers.  Named Plaintiffs allege that, pursuant to IRS regulations, each

Named Defendant who was a provider of investment products bidding on municipal derivative transactions ("Provider Defendants") was required to certify "that it had not consulted with other potential [p]roviders, that its bid was not submitted solely as a courtesy bid, and that the bid was determined without regard to an agreement with another issuer or other person." (Id. ¶ 205.) Named Plaintiffs contend that they relied on such representations and "did not undertake further inquiry." (Id. ¶ 207.)

Named Plaintiffs also claim that Named Defendants who served as brokers for their municipal derivatives transactions ("Broker Defendants") repeatedly and falsely assured them that they were soliciting bids that were fair, competitively priced and complied with IRS rules and regulations which required municipal derivatives brokers to obtain at least three commercially reasonable bids. Broker Defendants allegedly used a standardized "Certificate of Bidding Agent" representing that at least three commercially reasonable bids had been received. (Id. ¶ 209.) The SCAC describes the specific bid forms used by Bucks County and the Mississippi Plaintiffs, and alleges that Named Plaintiffs and Class members all relied on such assurances.

Lastly, Named Plaintiffs contend that they relied on market pricing letters supplied by Named Defendants which

certified that the pricing on negotiated municipal derivatives transactions reflected a fair market price.

## II. DISCUSSION

Defendants move to dismiss the SCAC on grounds that (1) Named Plaintiffs have failed to state an antitrust conspiracy claim; (2) Named Plaintiffs claims are time-barred; and (3) the Internal Revenue Code and Treasury Department regulations preclude Named Plaintiffs' antitrust claims.

A.   FAILURE TO STATE A CLAIM

      1.   Legal Standard

In assessing a motion to dismiss under Rule 12(b)(6), dismissal of a complaint is appropriate if the plaintiff has failed to offer sufficient factual allegations making the asserted claim plausible on its face.  See Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949 (2009).  A court should not dismiss a complaint for failure to state a claim if the factual allegations sufficiently "raise a right to relief above the speculative level."  Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007).  The task of the court in ruling on a motion to dismiss is to "assess the legal feasibility of the complaint, not to assay the weight of the evidence which might be offered in support thereof."  In re Initial Pub. Offering Sec. Litig., 383 F. Supp. 2d 566, 574 (S.D.N.Y. 2005) (quotation marks omitted).  The court must accept all well-pleaded factual

allegations in the complaint as true, and draw all reasonable inferences in the plaintiff's favor.  Chambers v. Time Warner, Inc., 282 F.3d 147, 152 (2d Cir. 2002).

Section One of the Sherman Antitrust Act prohibits any "contract, combination in the form of trust or otherwise, or conspiracy, in restraint of [interstate] trade or commerce." 15 U.S.C. § 1.  The Supreme Court's decision in Twombly addressed the pleading standards for a § 1 claim to survive a motion to dismiss.  See 550 U.S. 544.  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Iqbal, 129 S. Ct. at  1949 (citing Twombly, 550 U.S. at 556).  It is clear from Twombly that when a § 1 claim is based solely on allegations of parallel conduct, to survive a motion to dismiss those allegations "must be placed in a context that raises a suggestion of a preceding agreement, not merely parallel conduct that could just as well be independent action."  550 U.S. at 557.

Regardless of whether parallel conduct is alleged, "[t]o survive a motion to dismiss under Twombly, it is not enough to make allegations of an antitrust conspiracy that are consistent with an unlawful agreement; to be viable, a complaint must contain 'enough factual matter (taken as true)

-16-

to suggest that an agreement [to engage in anticompetitive conduct] was made.'"  In re Elevator Antitrust Litig., 502 F.3d 47, 50 (2d Cir. 2007) (alteration in original) (quoting Twombly, 550 U.S. at 556).  The complaint must contain enough factual matter "to raise a reasonable expectation that discovery will reveal evidence of illegal agreement." Twombly, 550 U.S. at 545.

Defendants argue that Named Plaintiffs' antitrust claims sound in fraud and thus are subject to the heightened pleading standard of Rule 9(b).  Defendants rely primarily on on two cases in which antitrust claims were held to the Rule 9(b) standard.  See Lum v. Bank of America, 361 F.3d 217, 229 (3d Cir. 2004) ("Because plaintiffs have alleged fraud as the basis of their antitrust cause of action, this claim is subject to the heightened pleading requirement of Rule 9(b)"); Michael Anthony Jewelers, Inc. v. Peacock Jewelry, Inc., 795 F. Supp. 639, 649 (S.D.N.Y. 1992) ("Peacock's [Sherman Act, § 2] antitrust claim relies heavily on charges of fraud and therefore those allegations must be scrutinized under Fed. R. Civ. P. 9(b)").  Defendants contend that Named Plaintiffs have alleged that "the purported conspiracy was accomplished in part through fraudulent acts" and thus their pleadings are subject to Rule 9(b) review.  (Memorandum in Support of Defendants' Joint Motion to Dismiss the SCAC, dated September

18, 2009 ("Defs.' Joint Memo"), at 16.) Specifically, Defendants assert that "Plaintiffs allege that defendants submitted false bids to create the appearance of competition and signed letters falsely certifying that negotiated transactions were priced fairly." (Id.)

As an initial matter, the Court notes that the cases relied on by Defendants do not represent the law of this Circuit, and the Court is thus not bound by their application of Rule 9(b) to antitrust pleadings. See Starr v. Sony BMG Music Entm't, 592 F.3d 314, 321 (2d Cir. 2010) (applying Twombly notice pleading standard to antitrust claims); Elevator Antitrust Litig., 502 F.3d at 49-50 (applying Twombly to § 1 price-fixing claims). The Court nonetheless finds that the instant dispute does not sound in fraud and is distinguishable from both Lum and Michael Anthony Jewelers. In Lum, the Third Circuit found that antitrust claims were subject to Rule 9(b) "[b]ecause plaintiffs allege[d] that the defendants accomplished the goal of their conspiracy through fraud." 361 F.3d at 228. The Lum plaintiffs alleged that banks entered into a conspiracy "designed to fraudulently and artificially inflate" the interest rates at issue. Id. In Michael Anthony Jewelers, plaintiffs' Sherman Act, 15 U.S.C. § 2 monopolization claim arose out of "fraudulently obtained copyright registrations" from the United States Copyright

-18-

Office.  795 F. Supp. at 644.  In both cases, fraud was at the heart of the alleged conspiratorial conduct.  It may be that in some cases, such as in the instant litigation, fraudulent acts may inevitably constitute an inherent by-product of defendants' collusive conduct, or else a collateral means they employed to carry out the alleged conspiracy.  For the purposes of antitrust pleadings, however, what counts as decisive are the primary anticompetitive activities that comprise plaintiffs' theory as pled in the complaint, and not necessarily any ancillary offshoots of other unlawful conduct.  On the other hand, when fraud constitutes an integral and dominant element of the antitrust claim, courts have held the pleadings to the Rule 9(b) standard.  See, e.g., Michael Anthony Jewelers, 795 F. Supp. at 649 ("antitrust claim relies heavily on charges of fraud and therefore ... must be scrutinized under Rule 9(b)"); Commonwealth of Pennsylvania v. Derry Const. Co., Inc., 617 F. Supp. 940, 941 (D.C. Pa. 1985) (finding pleadings deficient under Rule 9(b) where alleged predicate act in furtherance of antitrust conspiracy was mail fraud).

Here, Named Plaintiffs do not allege that Defendants achieved the goal of their conspiracy through fraud, nor does the Court find that fraudulent conduct constitutes an integral element of the SCAC's § 1 claims.  Rather, at their core,

-19-

Named Plaintiffs' claims assert bid-rigging, price-fixing and other collusive communications as the primary unlawful means Defendants used.   The alleged agreements among Broker and Provider Defendants to rig bids and fix prices do not sound in fraud, but instead represent classic § 1 conduct subject to Rule 8(a) pleading standards.   <u>See</u>, <u>e.g.</u>, <u>Stolow v. Greg Manning Auctions, Inc.</u>, 258 F. Supp. 2d 236, 242 (S.D.N.Y. 2003) (applying Rule 8(a) to § 1 bid-rigging conspiracy claims at motion to dismiss stage); <u>In re Nine West Shoes Antitrust Litig.</u>, 80 F. Supp. 2d 181, 185 (S.D.N.Y. 2000) (applying Rule 8(a) to § 1 price-fixing conspiracy claims at motion to dismiss stage). While Named Plaintiffs allege that Defendants employed fraud to conceal their anticompetitive conduct, those allegations relate to fraudulent concealment for the purposes of tolling the statute of limitations, not to the operative § 1 claims. (<u>See</u> SCAC ¶ 213.)

    2.   <u>Named Plaintiffs' Standing</u>

    Defendants also assert that the Court should dismiss the SCAC pursuant to Rule 12(b)(6) because Named Plaintiffs fail to plead facts on which to base Article III standing. Defendants argue that Named Plaintiffs have not offered any detail relating to their transactions that were "tainted by collusion or that they suffered an injury-in-fact traceable to defendants' alleged conduct." (Defs.' Joint Memo at 18.)

To demonstrate Article III standing, "a plaintiff must have suffered an 'injury in fact' that is 'distinct and palpable'; the injury must be fairly traceable to the challenged action; and the injury must be likely redressable by a favorable decision." Ross v. Bank of America, 524 F.3d 217, 222 (2d Cir. 2008) (quoting Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61 (1992)). "Injury in fact is a low threshold ... [which] need not be capable of sustaining a valid cause of action, but may simply be the fear or anxiety of future harm." Ross, 524 F.3d at 222 (quoting Denney v. Deutsche Bank AG, 443 F.3d 253, 264 (2d Cir. 2006)).

Here, the SCAC alleges that the bids charged by Defendants to Named Plaintiffs and Class members were fixed, stabilized and maintained at non-competitive levels throughout the United States; that Named "Plaintiffs and other members of the Class received lesser interest rates on [m]unicipal [d]erivatives than they would have received in a competitive marketplace, unfettered by [Named] Defendants and their co-conspirators' collusive and unlawful activities"; and "as a direct and proximate result of the illegal combination, contract or conspiracy, [Named] Plaintiffs and members of the Class have been injured and financially damaged in their businesses and property, in amounts to be determined." (SCAC ¶ 196.)  Named Plaintiffs have thus alleged injury to their

business and property, traceable to the alleged conduct of Defendants, that would be redressable by a favorable verdict. Accordingly, the Court finds that, for pleading purposes, Named Plaintiffs have alleged sufficient facts to support a finding of Article III standing.

Defendants argue that the SCAC does not support Named Plaintiffs' standing because the SCAC lacks specifics regarding Named Plaintiffs' alleged injury.  However, it is well-settled that "[a]t the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss we 'presum[e] that general allegations embrace those specific facts that are necessary to support the claim.'" Defenders of Wildlife, 504 U.S. at 561 (quoting Lujan v. Nat'l Wildlife Federation, 497 U.S. 887, 889 (1990)).  This standard must be amplified in antitrust conspiracy cases, where specific details regarding the injury suffered by an individual plaintiff may not be accessible until after discovery.  See Hospital Bldg. Co. v. Trustees of Rex Hosp., 425 U.S. 738, 746 (1976) ("[I]n antitrust cases, where the proof is largely in the hands of the alleged conspirators, dismissals prior to giving the plaintiff ample opportunity for discovery should be granted very sparingly." (citation and quotation omitted)).

### 3.  <u>Plausibility Analysis</u>

In its April 2009 Decision, the Court dismissed claims against Original Defendants that were not supported by specific factual averments of participation in the alleged conspiracy.  A complaint that enumerates "basically every type of conspiratorial activity that one could imagine" and that lists "in entirely general terms without any specification of any particular activities by any particular defendant" is "nothing more than a list of theoretical possibilities, which one could postulate without knowing any facts whatever." <u>Elevator Antitrust Litig.</u>, 502 F.3d at 50-51 (<u>quoting</u> <u>In re Elevator Antitrust Litig.</u>, No. 04 CV 1178, 2006 WL 1470994, at *2-*3 (S.D.N.Y. May 30, 2006)).  "The plausibility standard applicable is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully."  Iqbal, 129 S. Ct. at 1950 (citing Twombly, 550 U.S. at 556).

As noted above, the Court in its April 2009 Decision found the alleged conspiracy plausible as to the Surviving Defendants -- BoA, Bear Stearns, JP Morgan, Piper Jaffray, Natixis, CDR, Winters and Baum.  Because the SCAC reasserts the CAC's allegations against the Surviving Defendants, the Court will evaluate only whether Named Plaintiffs have satisfied their pleading burden as to the other Named

-23-

Defendants:  Investment  Management,  Sound  Capital,  UBS,
NatWest, Morgan Stanley, Société Générale, Wachovia, and Wells
Fargo.

Defendants argue that Named Plaintiffs' claims should
again be dismissed because "the SCAC fails to allege any facts
showing a single conspiracy among all the defendants, or among
any  subset  of  defendants  regarding  the  entire  municipal
derivatives  industry."   (Defs.'  Joint  Memo  at  12.)   In
essence, Defendants contend that even where the SCAC contains
allegations of individual acts of wrongdoing, the allegations
fail to specify the who, when or where of each allegation of
conspiratorial conduct and thus must be dismissed for failing
to state an antitrust conspiracy claim.  The Court disagrees.
As  described  above,  while  conclusory  allegations  devoid  of
factory  specificity  are  insufficient  to  survive  a  motion  to
dismiss,  under  Twombly,  plaintiffs  must  allege  simply  a
factory  basis  sufficient  to  establish  a  plausible  inference  of
an anticompetitive agreement among defendants.  Further, for
pleading purposes, plaintiffs are not required to prove the
existence of an alleged industry-wide conspiracy.  See, e.g.,
Dahl v. Bain Capital Partners, LLC, 589 F. Supp. 2d 112, 118-
19  (D.  Mass.  2008);  In  re  Static  Random  Access  Memory
Antitrust Litig., 580 F. Supp. 2d 896, 901-02 (N.D. Cal.
2008).

At this stage, plaintiffs must plead only "enough factual matter (taken as true) to suggest that an agreement [to engage in anticompetitive conduct] was made." <u>Elevator Antitrust Litig.</u>, 502 F.3d at 50.   A § 1 complaint must adequately allege the plausible involvement of each defendant and put defendants on notice of the claims against them, but it need not be detailed with overt acts by each defendant. <u>See</u> <u>In re Nasdaq Market-Makers Antitrust Litig.</u>, 894 F. Supp. 703, 712 (S.D.N.Y. 1995); <u>In re Potash Antitrust Litig.</u>, 667 F. Supp. 2d 907, 932 (N.D. Ill. 2009); <u>In re TFT-LCD Antitrust Litig.</u>, 599 F. Supp. 2d 1179, 1184 (N.D. Cal. 2009); <u>In re OSB Antitrust Litig.</u>, No. 06-826, 2007 WL 2253419, at *5 (E.D. Pa. Aug. 3, 2007).   "Nonetheless, it is not ... proper to assume that the [plaintiff] can prove facts that it has not alleged or that the defendants have violated the antitrust laws in ways that have not been alleged." <u>George Haug Co. v. Rolls Royce Motor Cars, Inc.</u>, 148 F.3d 136, 139 (2d Cir. 1998) (<u>quoting</u> <u>Associated Gen. Contractors of Cali., Inc. v. California State Council of Carpenters</u>, 459 U.S. 519, 526 (1983)).

The Court of Appeals for the Second Circuit recently addressed the issue of a § 1 plaintiff's pleading burden.   In <u>Starr</u>, 592 F.3d 314, the Second Circuit rejected the defendants' argument that <u>Twombly</u> requires a plaintiff to

identify the specific time, place or person related to each antitrust conspiracy allegation.  See Starr, 592 F.3d at 325. Instead, the Circuit Court reiterated the language and reasoning of Twombly: "Asking for plausible grounds to infer an agreement does not impose a probability requirement at the pleading stage; it simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal agreement." Starr, 592 F.3d at 322 (quoting Twombly, 550 U.S. at 556).

In its plausibility analysis, the Court will also consider the SCAC in light of recent developments in state and federal investigations into the municipal derivatives industry.  Although pending government investigations may not, standing alone, satisfy an antitrust plaintiff's pleading burden, government investigations may be used to bolster the plausibility of § 1 claims.  See Starr, 592 F.3d at 324-25 (finding that investigations by New York State Attorney General and DOJ Antitrust into defendants' price-fixing support plausibility of § 1 claim); see also Hyland v. Homeservices of America, Inc., No. 3:05-CV-612-R, 2007 WL 2407233, at *3 (W.D. Ky. Aug. 17, 2007) (finding that DOJ enforcement actions supported § 1 price-fixing allegations); In re Tableware Antitrust Litig., 363 F. Supp. 2d 1203, 1205 (N.D. Cal. 2005) ("A plaintiff may surely rely on governmental

investigations, but must also ... undertake his own reasonable inquiry and frame his complaint with allegations of his own design.").

As noted above, on October 29, 2009, a grand jury in this district returned an indictment against CDR and CDR employees for criminal antitrust violations in the municipal derivatives industry.  Further, on November 4, 2009, the Securities and Exchange Commission issued a cease and desist order against JP Morgan for its role in an unlawful payment scheme that enabled them to win business involving municipal bond offerings and swap agreement transactions with Jefferson County, Alabama. See Securities and Exchange Commission Order Instituting Administrative Cease-and-Desist Proceedings, In the Matter of JP Morgan, File No. 3-13673 (Nov. 4, 2009).  And finally, the SCAC alleges ongoing investigations by the DOJ and state attorneys general into the municipal derivatives practices of numerous banks and brokers, including Investment Management Advisory, Sound Capital, Société Générale, Winters, JP Morgan, UBS, NatWest and Wachovia. (See SCAC ¶¶ 166, 173.)

a.   Morgan Stanley Allegations

In its April 2009 Decision, the Court found that the CAC made no specific allegation regarding Morgan Stanley's involvement in the alleged conspiracy.   See Hinds, 620 F. Supp. 2d at 512.  Here, the SCAC's only specific allegation as

to Morgan Stanley provides, "In one taped conversation between [Douglas] Campbell [of BoA] and [James] Towne of Piper Jaffray, Towne stated that he gave Morgan Stanley the opportunity to lower its bid on a transaction through ... a 'last look.'" (SCAC ¶ 115.) Defendants urge the Court to dismiss Named Plaintiffs' claims against Morgan Stanley because they rely entirely on this singular allegation. Defendants argue that the SCAC fails to allege sufficient detail about Morgan Stanley's purported involvement. The Court disagrees. For pleading purposes, a plaintiff must "make allegations that plausibly suggest that each Defendant participated in the alleged conspiracy," Static Random Access Memory, 580 F. Supp. 2d at 904, but, as noted above, "an overt an act need not be pleaded against each defendant." Nasdaq Market-Makers, 894 F. Supp. at 712. In other words, Named Plaintiffs must make allegations, taken as true, supporting a plausible inference that Morgan Stanley participated in the alleged conspiracy. To do this, Named Plaintiffs need not necessarily provide any particular details about conduct undertaken by Morgan Stanley in furtherance of the conspiracy. See Starr, 592 F.3d at 325.

Taken as true, Named Plaintiffs' allegations that another alleged co-conspirator provided Morgan Stanley the opportunity to lower its bid on a municipal derivatives transaction makes

it plausible that Morgan Stanley participated in the alleged
conspiracy.  In reaching this conclusion, the Court also takes
judicial notice of the first amended complaint filed on
September 15, 2009 in City of Los Angeles v. Bank of America,
08 Civ. 2516 (S.D.N.Y.) (the "L.A. Complaint"), a related
action also before this Court as part of the MDL.  The L.A.
Complaint contains a specific allegation connecting Morgan
Stanley to bid-rigging in a Rhode Island municipal derivatives
transaction.  (See Plaintiffs' Request for Judicial Notice in
Support of Memorandum in Opposition to Defendants' Joint
Motion to Dismiss the SCAC, dated October 19, 2009 ("Pls.'
First Request for Judicial Notice"), Ex. 1 ¶ 321.)  "It is
well established that a district court may rely on matters of
public record in deciding a motion to dismiss under Rule
12(b)(6)."  Pani v. Empire Blue Cross Blue Shield, 152 F.3d
67, 745 (2d Cir. 1998); see also Rothman v. Gregor, 220 F.3d
81, 92 (2d Cir. 2000).  Accordingly, the Court finds Morgan
Stanley's participation in the alleged conspiracy to be "above
the speculative level" and that there exists "reasonably
founded hope that the [discovery] process will reveal relevant
evidence to support a § 1 claim."  Twombly, 550 U.S. at 559
(quotation omitted).

b.    <u>Investment Management Advisory Allegations</u>

The Court also previously dismissed the CAC's claims against Investment Management Advisory, finding that the plaintiffs had made no specific allegations regarding its involvement in the alleged conspiracy. <u>See</u> <u>Hinds</u>, 620 F. Supp. 2d at 512. By contrast, here, the SCAC describes numerous collusive transactions that were allegedly brokered through Investment Management Advisory that have been identified through audiotapes, the Confidential Witness[5] and emails. The SCAC alleges numerous communications between the Confidential Witness and Stallone -- the purported managing director of Investment Management Advisory -- illustrating Investment Management Advisory's role in coordinating bids

_____

[5]   The Court notes that Defendants contest Named Plaintiffs' pleadings based on information purportedly provided by the Confidential Witness, arguing that the SCAC does not describe the Confidential Witness "with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged." <u>Novak v. Kasaks</u>, 216 F. 3d 300, 314 (2d Cir. 2000). However, Defendants improperly urge the Court to apply the standard of particularity required for reliance on confidential sources in securities fraud claims. The Court is not persuaded that a similar standard applies here. Nonetheless, even if the Court were to apply the standard of particularity urged by Defendants, contrary to Defendants' assertions, "[p]laintiffs [would] not [be] required to plead exact job titles, describe the [confidential] sources' responsibilities and duties in detail or allege access to specific company documents." <u>In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.</u>, 324 F. Supp. 2d 474, 493 (S.D.N.Y. 2004). The SCAC describes the Confidential Witness as a former employee of BoA "who is cooperating with the DOJ in its antitrust investigation and whose identity has not been revealed to Plaintiffs," (SCAC ¶ 90), and joined BoA's municipal derivatives trading desk in April 1999. (<u>See</u> SCAC ¶ 102.) Given BoA's ongoing cooperation with the DOJ's antitrust investigation into the municipal derivatives industry, the Court, taking Named Plaintiffs' averments regarding the Confidential Witness as true, accepts that the Confidential Witness would possess the information alleged for the purposes of this motion to dismiss.

-30-

among numerous Defendants.  These allegations, taken as true, make the § 1 claim against Investment Management Advisory plausible for the purposes of a motion to dismiss.

c.   Sound Capital Allegations

The SCAC also makes specific allegations of participation in the alleged conspiracy against Sound Capital.  Named Plaintiffs allege that the President and former Vice President of Sound Capital, Johan Rosenberg ("Rosenberg"), advised the Confidential Witness what bid BoA needed to enter in order to win a municipal derivatives trade.  The SCAC further alleges that Sound Capital brokered several collusive transactions for which BoA and Wachovia were bidders.  For one of the transactions, involving an escrow deposit agreement, Rosenberg allegedly advised Campbell of BoA about other bids.  Taken as true, these allegations support a plausible inference that Sound Capital participated in the alleged conspiracy.

d.   UBS Allegations

The Court found that the CAC's general allegations that UBS employees engaged in collusive communications were insufficient to state a claim as to UBS.  See Hinds, 620 F. Supp. 2d at 518.  Here, Named Plaintiffs have alleged specific examples of collusive communications involving an employee of UBS's municipal derivatives trading desk, Mark Zaino ("Zaino"), and a BoA employee.  The SCAC alleges that there

exists audiotape recordings of discussions between a BoA employee and Zaino discussing the pricing terms and timing of BoA's bid for an escrow funding and forward purchase agreement for the Commonwealth of Massachusetts.  The Court finds that UBS's participation in these communications, as alleged, supports a plausible inference that UBS participated in the alleged conspiracy.

      e.   <u>NatWest Allegations</u>

The April 2009 Decision dismissed the CAC's claims against NatWest for failing to allege a specific factual connection between NatWest and the conspiracy.  <u>See</u> <u>Hinds</u>, 620 F. Supp. 2d at 512.  The SCAC alleges that Stallone of Investment Management Advisory on one occasion told the Confidential Witness that he had received courtesy bids from NatWest and that "on at least one occasion, Stallone told the [Confidential Witness] that BoA should back down from a trade because it was slated to go to NatWest."  (SCAC ¶ 109.)  In addition, as noted above, the SCAC alleges that state attorneys general have issued subpoena requests to NatWest regarding their municipal derivatives trading.

Defendants argue that the Court should again dismiss the claims against NatWest because the SCAC's factual allegations "do not make the conspiracy alleged against [NatWest] any more plausible" than the CAC's allegations.  (Supplemental

Memorandum of Law in Support of NatWest's Motion to Dismiss the SCAC, dated September 18, 2009, at 5.)   The Court disagrees.  The SCAC's specific factual allegation connecting NatWest to the alleged conspiracy must be viewed in light of the complaint as a whole.  See Continental Ore Co. v. Union Carbide and Carbon Corp., 370 U.S. 690, 699 (1962) (finding in an antitrust case that "the character and effect of a conspiracy are not to be judged by dismembering it and viewing its separate parts, but only by looking at it as a whole"); In re Rail Freight Fuel Surcharge Antitrust Litig., 587 F. Supp. 2d 27, 33 (D.D.C. 2008) (considering allegations of complaint as a whole to evaluate plausibility of § 1 claim).  The plausibility of the conspiracy alleged by the SCAC is bolstered in significant part by the allegations of conduct undertaken by the Confidential Witness in concert with Stallone.  The SCAC is replete with detailed allegations regarding the acts in furtherance of the conspiracy orchestrated by Stallone and the Confidential Witness. Viewed in this context, it is reasonable to infer that NatWest colluded with the Confidential Witness and Stallone to rig the bidding for a municipal derivative trade.  That the allegation regarding NatWest is not pled with the same specificity as other Defendants does not undermine the plausibility of NatWest's involvement and the "reasonable expectation that

discovery will reveal evidence of illegal agreement."
Twombly, 550 U.S. at 556.  Accordingly, the Court finds that
the § 1 claim against NatWest is plausible for the purposes of
a motion to dismiss.

     f.   Société Générale Allegations

     The Court also found that the CAC failed to state a § 1
claim against Société Générale because the only allegations
against Société Générale did not appear to relate to municipal
derivatives.  See Hinds, 620 F. Supp. 2d at 517.  Defendants
argue that the SCAC adds no new allegations and should thus
again be dismissed.  Upon review of the SCAC, however, the
Court finds that Named Plaintiffs have cured the CAC's
deficiency as to Société Générale.  The SCAC now makes clear
that its allegations against Société Générale involve GICs --
a type of municipal derivatives investment instrument as
alleged in the SCAC. (See SCAC ¶ 67.)  Specifically, the SCAC
alleges that the IRS has found that "the awarding of bids for
GICs was prearranged to allow Société Générale to inflate
various fees and divert illegal arbitrage as part of what the
IRS called a larger plan involving numerous other bond
issuances." (Id. ¶ 137 (quotation omitted).)  Taken as true,
the Court finds that these allegations support a plausible
inference that Société Générale participated in the alleged
conspiracy.

g.   <u>Wachovia and Wells Fargo Allegations</u>[6]

The Court found that the CAC's general allegations that Wachovia employees engaged in collusive communications were insufficient to state a claim as to Wachovia.   See Hinds, 620 F. Supp. 2d at 518.   Here, the SCAC alleges that Wachovia received "last looks" (see SCAC ¶ 116); agreed to provide sham courtesy bids to Stallone for CDs on escrow accounts for Pennsylvania school districts with no expectation of winning the deals (see id. ¶ 116); and bid on several collusive trades brokered through Sound Capital, including a forward purchase agreement involving the County of Santa Barbara, California. (See id. ¶ 125.)   These allegations, taken as true, make the § 1 claim against Wachovia and Wells Fargo plausible for the purposes of a motion to dismiss.

B.   <u>STATUTE OF LIMITATIONS AND FRAUDULENT CONCEALMENT</u>

The Court will next consider whether Named Plaintiffs have sufficiently alleged fraudulent concealment so as to toll the statute of limitations.   The lion's share of the SCAC's allegations identified as occurring on a particular date involve conduct prior to March 12, 2004, and thus are time-barred under the applicable four-year statute of limitations

---

[6]   The Court will consider the claims against Wachovia and Wells Fargo jointly because Wells Fargo is being sued as the successor in interest to Wachovia, having acquired Wachovia's assets and liabilities on December 31, 2008.   (<u>See</u> SCAC ¶ 30.)

for antitrust violations. <u>See</u> 15 U.S.C. § 15 (b). Named Plaintiffs contend that they have pled an ongoing conspiracy -- multiple overt acts in furtherance of the conspiracy after March 12, 2004[7] -- and thus the four-year statute of limitations does not apply. Although Named Plaintiffs are correct that a new overt act will restart the applicable statute of limitations, "the commission of a 'separate and new overt act' will not permit the plaintiff to recover for the injury caused by the old overt acts that do not fall within the limitations period." <u>Nine West Shoes</u>, 80 F. Supp. 2d at 192 (<u>quoting</u> <u>Klehr v. A.O. Smith Corp.</u>, 521 U.S. 179, 189 (1997)). Therefore, in order to recover for any injury caused by acts that occurred prior to March 2004, Named Plaintiffs must allege fraudulent concealment so as to toll the statute of limitations.

    1.  <u>Tolling for Fraudulent Concealment</u>

"The statute of limitations for an antitrust violation is tolled if plaintiff can show fraudulent concealment." <u>Nine West Shoes</u>, 80 F. Supp. 2d at 192 (<u>citing</u> <u>New York v.</u>

---

[7] Specifically, the SCAC alleges that the following acts occurred after March 12, 2004: (1) the Jefferson County, Alabama swaps bought between 2001 and June 2004 involving JP Morgan, Bear Stearns, BoA, CDR and Lehman (<u>see</u> SCAC ¶ 131); (2) a swap agreement involving JP Morgan and Investment Management Advisory for the Butler Area School District and Butler County General Authority, dated August 22, 2006, (<u>see</u> <u>id.</u> ¶ 135); (3) the Chicago Swap, (<u>see</u> <u>id.</u> ¶ 142); and (4) bond issuances by Biola University and related swaps involving BoA, which allegedly continued until November 2004. (<u>See</u> <u>id.</u> ¶ 143.)

<u>Hendrickson Bros., Inc.</u>, 840 F.2d 1065, 1083 (2d Cir. 1988)).
To show fraudulent concealment, "an antitrust plaintiff must
prove (1) that the defendant concealed the existence of the
antitrust violation[;] (2) that plaintiff remained in
ignorance of the violation until sometime within the four-year
antitrust statute of limitations; and (3) that his continuing
ignorance was not the result of lack of diligence." <u>Id.</u>  The
fraudulent concealment factors have also been described as:
"(1) wrongful concealment by defendants (2) which prevented
plaintiff's discovery of the nature of the claim within the
limitations period, and (3) due diligence in pursuing
discovery of the claim."[8]  <u>National Group for Commc'ns &
Computers, Ltd. v. Lucent Techs. Inc.</u>, 420 F. Supp. 2d 253,
265 (S.D.N.Y. 2006).  A claim of fraudulent concealment must
be pled with particularity, in accordance with the heightened
pleading standards of Rule 9(b). <u>See id.</u> at 265.

    a.   <u>Concealment by Defendants</u>

    Allegations of bid-rigging and price-fixing conspiracies
in violation of § 1 are self-concealing such that "a plaintiff

---

[8]  In <u>Hinds</u>, the Court recognized that the case law regarding the due
diligence prong is not entirely consistent.  <u>See</u> 620 F. Supp. at 521.
To evaluate the CAC, the Court applied the following standard: "Due
diligence is not adequately pled if plaintiffs 'did not allege in the
[complaint] that they exercised due diligence' or if they 'make no
allegation of any specific inquiries of [defendants], [or] detail when
such inquiries were made, to whom, regarding what, and with what
response.'"  <u>Id.</u> (quoting <u>In re Merrill Lynch Ltd. P'ships Litig.</u>, 154
F.3d 56, 60 (2d Cir. 1998)).

is not required to show defendants took independent affirmative steps to conceal their conduct." <u>Nine West Shoes</u>, 80 F. Supp. 2d at 193. "[B]y alleging a price-fixing scheme, the plaintiff sufficiently has alleged the first prong of fraudulent concealment and ... there is no need to require the pleading of affirmative actions taken by the defendants to prevent the plaintiff's discovery of its claim." <u>Id.</u> Named Plaintiffs therefore need to plead only ignorance of the violation and due diligence, both with the particularity required by Rule 9(b).

      b.   <u>Violation Not Discovered or Plaintiffs Remain Ignorant</u>

The Court found that the CAC did not plead fraudulent concealment because it did not specify when any Named Plaintiffs or Class members became aware of the antitrust violations, and therefore did "not state with particularity the circumstances constituting fraud or mistake." <u>Hinds</u>, 620 F. Supp. 2d at 520 (<u>citing</u> Fed. R. Civ. P. 9(b); <u>In Re Magnetic Audiotape Antitrust Litig.</u>, No. 99 Civ. 1580, 2002 WL 975678, at *3 (S.D.N.Y. May 9, 2002)).

The SCAC alleges that Named Plaintiffs and Class members were put on notice of their § 1 claims only once BoA participated in the DOJ leniency program in 2007. Defendants argue that Named Plaintiffs have failed to plead ignorance

because the CAC admitted that a transaction including a hidden payment from BoA to Baum was disclosed in July 2003.   The Court disagrees and finds that this isolated disclosure was not sufficient to put Named Plaintiffs or Class members on notice of the antitrust violations as alleged in the SCAC. "The requisite notice required to defeat a claim of fraudulent concealment is an awareness of sufficient facts to identify ... the particular cause of action at issue, not [notice] of just any cause of action." Molecular Diagnostics Labs v. Hoffman-La Roche, 402 F. Supp. 2d 276, 283-84 (D.D.C. 2005) (alteration in original) (quotation omitted); see also Vitamins, 2000 WL 1475705, at *5. Even if Defendants or Class members knew of BoA's payment to Baum prior to BoA's cooperation with the DOJ in 2007, the Court declines to find that notice of this single corrupted transaction provided sufficient facts to identify the § 1 claim alleged in the SCAC.   Accordingly, the Court finds that Named Plaintiffs' allegations satisfy the second prong of the fraudulent concealment test.

      c.   Due Diligence

To survive a motion to dismiss, plaintiffs need only plead, not prove, fraudulent concealment.   See Nine West Shoes, 80 F. Supp. 2d at 193.   Resolution of a claim of fraudulent concealment so as to toll the statute of

limitations is "intimately bound up with the facts of the case" and is thus not properly decided on a motion to dismiss. In re Mercedes-Benz Antitrust Litig., 157 F. Supp. 2d 355, 374 (D.N.J. 2001); see also In re Sumitomo Copper Litig., 120 F. Supp. 2d 328, 346-47 (S.D.N.Y. 2000). Nonetheless, that fraudulent concealment is not finally resolvable on a motion to dismiss does not "excuse plaintiffs from pleading the circumstances surrounding their diligence or lack thereof." In re Publication Paper Antitrust Litig., No. 304MD1631SRU, 2005 WL 2175139, at *6 n.7 (D. Conn. Sept. 7, 2005). As noted above, due diligence is not adequately pled if plaintiffs "did not allege in the [complaint] that they exercised due diligence" or if they "make no allegation of any specific inquiries of [defendants], [or] detail when such inquiries were made, to whom, regarding what, and with what response." Merrill Lynch, 154 F.3d at 60.

The SCAC makes several specific averments of fact regarding the inquiries undertaken by Named Plaintiffs and Class members. Named Plaintiffs allege that Provider Defendants in connection with a municipal derivatives transaction had to certify that they were not entering a courtesy bid and the bid was determined without regard to an agreement with another issuer. These certifications were made repeatedly to Named Plaintiffs who allegedly relied on them

and thus did not undertake further inquiry. (<u>See</u> SCAC ¶ 205.)
The SCAC provides examples describing the certification forms
used by Named Plaintiffs Bucks County, the Mississippi
Plaintiffs and Baltimore to certify bids made by Provider
Defendants or any other potential provider.  The SCAC also
alleges that Broker Defendants repeatedly assured Named
Plaintiffs and Class members that they were soliciting fair
and competitive bids that complied with IRS rules and
regulations.  (<u>See</u> <u>id.</u> ¶ 207.)  Named Plaintiffs have thus
pled with particularity the inquiries that were made, to whom,
regarding what, and with what response.  <u>See</u> <u>Merrill Lynch</u>,
154 F.3d at 60.  Although Named Plaintiffs have not
established that the inquiries undertaken comprised sufficient
due diligence for the purposes of proving fraudulent
concealment, such a showing is not required at the motion to
dismiss stage.  Accordingly, the Court finds that the SCAC
cures the deficiencies of the CAC and pleads fraudulent
concealment with sufficient particularity to satisfy the third
prong of the fraudulent concealment test for statute of
limitation purposes.

C.   <u>IRS and TREASURY REGULATIONS</u>

Defendants contend that even if the SCAC states an
operative § 1 claim, it must be dismissed as precluded by "an
extensive set of federal regulations governing the operation

-41-

of the market for tax-exempt municipal debt." (Defs.' Joint
Memo at 29.)   Defendants rely on <u>Credit Suisse Secs. LLC v.
Billing</u>, 551 U.S. 264 (2007), to argue that private antitrust
enforcement is precluded here because awarding damages to
Named Plaintiffs would conflict with IRS and Treasury
Department regulations governing tax-exempt debt (the "IRS
Regulations"), including the reinvestment of municipal bond
proceeds.[9]  <u>See</u> 26 U.S.C. §§ 103, 141-150; 26 C.F.R. §§ 1.141-
0 to 1.150-5.  The IRS Regulations provide conditions for the
reinvestment of municipal bond proceeds which must be met in
order for the underlying bonds to qualify as tax-exempt.  <u>See</u>
26 C.F.R. §§ 1.148-0 to 1.148-11.   Included in these
conditions is the requirement that tax-exempt municipal bonds
not be used to earn "arbitrage profits" -- profits derived
from a greater return on the investment of bond proceeds than
the interest the municipality is required to pay its
bondholders.  <u>See</u> 26 U.S.C. § 148(a).

_____

[9] Defendants also allege that the SCAC does not plead a cognizable injury
because bond issuers must rebate to the IRS profits earned on the
reinvestment of tax-exempt bond proceeds.  The Court is not persuaded.
Earnings on municipal derivative investments that do not exceed bond
yields are not arbitrage as defined in the IRS Regulations.  <u>See</u> 26 C.F.R.
§ 1.148-3(a); 26 U.S.C. § 148(a).  Thus, as described above, the Court
finds that Named Plaintiffs have pled injury in fact, without needing to
reach the issue of whether arbitrage profits subject to tax rebates may
underpin a claim of injury for the purposes of Article III standing.

-42-

1.   Credit Suisse Secs. (USA) LLC v. Billing

The implied preclusion analysis turns on four considerations identified in Billing, where a group of securities buyers ("Buyers") filed an antitrust lawsuit against underwriting firms ("Underwriters") that market and distribute newly-issued securities ("IPOs").  See 551 U.S. 264; Electronic Trading Group, LLC v. Banc of Am. Sec. LLC, 588 F.3d 128 (2d Cir. 2009).  Buyers claimed that Underwriters unlawfully conspired to not sell shares of popular IPOs to Buyers unless Buyers agreed to purchase additional shares at escalating prices, pay Underwriters unusually high commissions on subsequent security purchases, and/or purchase other less desirable securities from Underwriters, in violation of § 1 of the Sherman Act, Section 2(c) of the Clayton Act, and state antitrust laws.  Underwriters moved to dismiss Buyers' antitrust claims, arguing that the federal securities laws implicitly precluded application of the antitrust laws to the conduct at issue.

The Supreme Court stated that, where regulatory statutes are silent regarding preclusion of antitrust laws, the "courts must determine whether, and in what respects, [the regulatory statutes] implicitly preclude application of the antitrust laws."  Billing, 551 U.S. at 271.  The securities laws implicitly preclude application of the antitrust laws, given

-43-

the context and likely consequences, when the two are "clearly incompatible." Id. at 275. The Court articulated four critical considerations for determining within a given context whether securities laws and antitrust laws are clearly incompatible: (1) "the possible conflict affected practices that lie squarely within an area of financial market activity that the securities law[s] seek[] to regulate"; (2) "the existence of regulatory authority under the securities law to supervise the activities in question"; (3) "evidence that the responsible regulatory entities exercise that authority"; and (4) "a resulting risk that the securities and antitrust laws, if both applicable, would produce conflicting guidance, requirements, duties, privileges, or standards of conduct." Id. at 275-76. The Court of Appeals for the Second Circuit has since identified the four Billing considerations as (1) whether the underlying market activity lies squarely within the heartland of the implicated regulations; (2) the existence of authority to regulate the "activities in question"; (3) ongoing regulation of those activities; and (4) conflict between the two regulatory regimes. See Electronic Trading Group, 588 F.3d at 133-37.

After applying the four considerations, the Supreme Court in Billing concluded that the federal securities laws implicitly precluded application of the antitrust laws to the

conduct at issue.  Under the first consideration, the Court found that Underwriters' efforts to promote and sell IPOs were "central to the proper functioning of a well-regulated capital market" and "lie at the very heart of the securities marketing enterprise." Id. at 276.  Under the second consideration, the Court found that the securities laws granted the United States Securities and Exchange Commission (the "SEC") authority to supervise the conduct at issue, including the power to "forbid, permit, encourage, discourage, tolerate, limit, and otherwise regulate virtually every aspect of the practices in which underwriters engage." Id. (citing 15 U.S.C. §§ 77b(a)(3), 77j, 77z-2, 78o(c)(2)(D), 78i(a)(6), & 78j(b)).  Under the third consideration, the Court found that the SEC has continuously exercised its authority to regulate the IPO transaction process, such as by regulating IPO communications and bringing actions against underwriters who violate IPO regulations.  And lastly, under the fourth consideration, the Court found a serious conflict between the antitrust and regulatory regimes.  See id. at 281-83. The Court found the antitrust claims precluded because "a fine, complex, detailed line separates activity that the SEC permits or encourages ... from activity that the SEC must (and inevitably will) forbid." Id. at 279.

After determining that the four prongs were satisfied, the Court concluded that, within the IPO context at issue, the securities laws were clearly incompatible with the application of the antitrust laws.

2.   Application of Billing to the SCAC

The Court will next consider whether, under Billing, the IRS Regulations implicitly preclude application of the antitrust laws to the conduct at issue here.   The Supreme Court recognized that, where regulatory statutes are silent in respect to antitrust, application of the Billing considerations "may vary from statute to statute, depending upon the relation between the antitrust laws and the regulatory program set forth in the particular statute, and the relation of the specific conduct at issue to both sets of laws."   551 U.S. at 271.   Courts have since employed the Billing considerations to examine whether other regulatory regimes, beyond the securities laws, preclude application of the antitrust laws.   See, e.g., In re Western States Wholesale Natural Gas Antitrust Litig., 661 F. Supp. 2d 1172 (D. Nev. 2009) (Commodity Exchange Act); Rectrix Aerodome Centers, Inc. v. Barnstable Mun. Airport Comm'n, 534 F. Supp. 2d 201 (D. Mass. 2008) (Federal Aviation Administration regulations).

For the reasons described below, the Court finds that the IRS Regulations do not implicitly preclude application of the antitrust laws to the conduct alleged in the SCAC.

a.   <u>Heartland</u>

The first consideration under <u>Billing</u> is whether the underlying market activity lies squarely within the heartland of the IRS Regulations.   <u>See</u> <u>Billing</u>, 551 U.S. at 276; <u>Electronic Trading Group</u>, 588 F.3d at 133-34.   The IRS Regulations provide specific rules that govern the process by which tax-exempt municipal bond investments are priced and awarded, and the IRS has the authority to reclassify municipal bonds as taxable if bond issuers do not abide by IRS Regulations.   The Court thus finds that the investment of tax-exempt municipal bond proceeds -- the underlying market activity at issue in this case -- is an area of conduct squarely within the heartland of federal tax regulations.

Named Plaintiffs argue that to ascertain whether the antitrust allegations lie squarely within an area of activity that the tax laws seek to regulate, the Court must look to the specific conduct at issue in the SCAC.   (<u>See</u> Plaintiffs' Memorandum in Opposition to Defendants' Joint Motion to Dismiss the SCAC, dated October 19, 2009, at 50.)   However, as articulated in <u>Electronic Trading Group</u>, the proper inquiry under the first prong of <u>Billing</u> requires consideration of the

-47-

"underlying market activity," not the alleged anticompetitive conduct.  Electronic Trading Group, 588 F.3d at 133-34.   The Second Circuit found that the specific activities in question are more appropriately considered under the second prong of Billing.  Therefore, the Court finds that the investment of tax-exempt municipal bond proceeds, the underlying market activity, falls squarely within the heartland of IRS regulation, and that the first prong of Billing weighs in favor of implied preclusion.

     b.   Authority to Regulate

The Court must next consider "the existence of regulatory authority under the [tax laws] to supervise the activities in question."  Billing, 551 U.S. at 275.  This inquiry involves consideration of whether the regulatory scheme covers activity "that is more particular than ... the underlying market activity ... and more general than ... the alleged anticompetitive conduct."  Electronic Trading Group, 588 F.3d at 134.  As noted above, the IRS has authority to regulate the issuance of municipal derivatives.  However, its quasi-judicial authority does not extend to supervision of "all the activities in question."  Billing, 551 U.S. at 276. Defendants assert that under 26 U.S.C. § 6700(a), the IRS may levy a penalty on any person who knowingly makes a materially false statement in connection with the issuance of municipal

-48-

bonds, and it uses this power to control how bond proceeds are reinvested by requiring investment providers to certify that they have not colluded while preparing their bids. (<u>See</u> Defs.' Joint Memo at 38.)

Insofar as the IRS can regulate bidding conduct of issuers and providers at an auction for municipal derivatives by requiring certain disclosures and certifications, the IRS Regulations do indeed regulate the conduct of municipal derivatives transactions. Nonetheless, this regulatory authority does not cover the full spectrum of conduct that the SCAC alleges culminated in Defendants' antitrust violations. <u>See</u> 26 U.S.C. §§ 141-150; 26 C.F.R. §§ 1.141-0 to 1.150-5; <u>see also</u> <u>Pennsylvania Ave. Funds v. Borey</u>, 569 F. Supp. 2d 1126, 1130 (W.D. Wash. 2008) (finding no preclusion where SEC's power limited to requiring disclosure because disclosure is neither a remedy for anticompetitive conduct nor a defense to the imposition of liability). While Defendants attempt to portray the conduct at issue as an "abusive arbitrage scheme" in order to bring the alleged conduct entirely within the ambit of the IRS's regulatory authority, (<u>see</u> Defs.' Joint Memo at 40), the anticompetitive conduct alleged by Named Plaintiffs goes far beyond an attempt to avoid taxes. The Court is not persuaded that the IRS has the authority to regulate the activities in question, namely a conspiratorial

agreement to rig bids and fix prices.  See Billing, 551 U.S. at 275; Electronic Trading Group, 588 F.3d 133-34.  As a result, the second Billing consideration weighs against implied preclusion.

    c.   Ongoing Regulation

Third, the Court must evaluate whether the regulatory agency in question has "continuously exercised its legal authority to regulate conduct of the general kind now at issue." Billing, 551 U.S. at 277; see also Electronic Trading Group, 588 F.3d at 135.  Here, the IRS has not regularly exercised its legal authority to regulate the collusive price-fixing and bid-rigging practices as alleged in the SCAC, and in the way that would fall within the regulatory ambit of an agency such as the Federal Trade Commission.  As described above, the IRS's regulatory authority in this context extends only to tax penalties that are owed to the IRS.  Defendants point to the SCAC's allegation that the "IRS was the first agency to launch an investigation of collusive practices in the [m]unicipal [d]erivatives industry" to assert that the IRS regulates the conduct in question. (Defs.' Joint Memo at 41 (quoting SCAC ¶ 155).)  Yet, as evidenced by the DOJ's indictment of CDR and BoA's entry to the DOJ leniency program, the collusive conduct in question falls, in part, under the regulatory authority of DOJ Antitrust.  In fact, the SCAC

alleges that after the IRS found allegations of bid-rigging, it referred the matter to DOJ Antitrust. (<u>See</u> SCAC ¶¶ 156, 158.) Taken as true, this referral stands in stark contrast to <u>Billing</u>, where the SEC filed a brief, in opposition to the DOJ, seeking "total preclusion of the antitrust laws." 551 U.S. at 224. The referral to DOJ Antitrust further illustrates that the IRS itself acknowledges that it does not regulate the "conduct of the general kind now at issue." <u>Billing</u>, 551 U.S. at 277. The third <u>Billing</u> consideration thus weighs against implied preclusion.

     d.   <u>Conflict</u>

The Court must finally consider whether, as regards the unlawful conduct charged in the SCAC, there is a conflict between the IRS Regulations and the antitrust laws. In articulating its fourth consideration, the Supreme Court cautioned against permitting the application of both the antitrust and securities laws where the resulting effect "would produce conflicting guidance, requirements, duties, privileges, or standards of conduct." <u>Billing</u>, 551 U.S. at 275-76. "The Supreme Court considered whether allowing antitrust liability for the conduct alleged to have the anticompetitive effect would inhibit permissible (and even beneficial) market behavior." <u>Electronic Trading Group</u>, 588 F.3d at 136. For the purposes of the alleged conduct at issue

here, the Court finds that there is no conflict between the IRS Regulations and private enforcement of the antitrust laws.

Defendants contend that Named Plaintiffs' private antitrust claim "would undermine the regulatory prohibition against arbitrage profits [in the IRS Regulations] by granting issuers a windfall that would never have been permitted outside this lawsuit." (Defs.' Joint Memo at 42.) Defendants assert that any damages in this case must necessarily be calculated by applying the pricing rules set forth in the IRS Regulations. (Id. at 51 n.23.) But the Court is not persuaded that the tax consequences of any damage award should preclude application of the antitrust laws. As noted above, earnings from the reinvestment of municipal bond proceeds that do not exceed the relevant bond yield proceeds do not constitute arbitrage profits under the IRS Regulations. Thus, the Court finds that a determination of what, if any, portion of a damage award must be rebated to the IRS is more appropriately determined if and when recovery occurs, and does not implicitly preclude application of the antitrust laws to the conduct at issue here. See Hanover Shoe, Inc. v. United Shoe Machinery, Corp., 392 U.S. 481, 502-03 (1968) (rejecting argument that antitrust damages should comprise only after-tax profits, finding that IRS taxes recoveries at time received).

-52-

Defendants further assert that because the IRS Regulations, as regards the transactions at issue here, require only that the pricing of municipal derivative instruments be at "fair market value," 26 C.F.R. § 1.148-5(d)(3)(i), Named Plaintiffs' private antitrust enforcement based on their alleged failure to obtain "the best possible price" generates "the sort of difficult legal line-drawing" cautioned against in <u>Billing</u>. (Defs.' Joint Memo at 44.) Defendants argue that, by bringing this § 1 claim, Named Plaintiffs "seek to turn the [IRS] regulatory scheme on its head, transforming it from a mechanism designed to protect federal revenues into a tool to promote private profits." (<u>Id.</u> at 45.) The Court is not persuaded and finds that the fair market value standard does not conflict with application of the antitrust laws.

The IRS's authority to regulate the conduct of municipal derivative auctions for the purpose of protecting federal tax revenues and Named Plaintiffs' ability to bring a § 1 claim to protect profits resulting from their investments are not mutually exclusive pursuits. To the contrary, the tax and antitrust laws, rather than being in conflict, are complementary. Both operate to ensure that a municipality can rely on the competitive bidding process to establish the fair market value of municipal derivatives. Just as the IRS

-53-

Regulations require certification that a provider of municipal derivative products has not consulted with other potential providers about its bid, <u>see</u> 26 C.F.R. § 1.148-5(d)(6)(iii)(3), the Sherman Act also prohibits such anticompetitive practices, albeit to achieve a different statutory purpose.

Further, unlike <u>Billing</u>, where the Underwriters were required to work in concert to promote and sell IPOs, here, there is no indication that Broker Defendants or Provider Defendants had any lawful reason to engage in the collusive conduct alleged in the SCAC. Defendants do not argue, nor do the IRS regulations explicitly or implicitly suggest, that brokers and providers are to collectively communicate about or decide what the fair market value is for a municipal derivative investment.

The instant dispute is similarly distinguishable from the controversy involved in <u>In re Short Sale Antitrust Litig.</u>, 527 F. Supp. 2d 253 (S.D.N.Y. 2007), <u>aff'd</u> <u>sub</u> <u>nom.</u>, <u>Electronic Trading Group</u>, 588 F.3d 128, where this Court found that the securities laws implicitly precluded application of the antitrust laws. The short sale transactions at issue there necessarily involved the exchange of information regarding the availability and price of securities. <u>See</u> <u>Short Sale</u>, 527 F. Supp. 2d at 260. A serious legal line-drawing problem thus

existed because the SEC permitted or encouraged certain daily communications among defendant-brokers, but forbid others.

By contrast, here, there is no "fine, complex, detailed line" that must be drawn to separate permissible or impermissible activity in the municipal derivatives market. See Billing, 551 U.S. at 279; see also Mayor and City Council of Baltimore, Md. v. Citigroup, Inc., Nos. 08 Cv. 7746, 7747, 2010 WL 430771, at *6 (S.D.N.Y. Jan. 26, 2010) (finding that "fine line-drawing exists" where collective action amongst certain broker dealers permitted or encouraged in certain circumstances). Nor is there a risk of inconsistent court results in factually similar circumstances because of any tax-related expertise necessary to distinguish between permissible and impermissible conduct. See Billing, 551 U.S. at 265. Accordingly, the Court finds that application of the antitrust laws to the conduct alleged in the SCAC does not conflict with application of the IRS Regulations, and finds that the fourth Billing consideration weighs against preclusion.

e.    No Implied Preclusion

Having reviewed the instant dispute in light of the Billing considerations, the Court finds that application of the antitrust laws to the dispute at hand is not implicitly precluded by the IRS Regulations. Three of four Billing considerations weigh against implied preclusion. Although the

regulation of tax-exempt municipal derivatives does fall squarely within the heartland of IRS regulation, municipal derivative investments are properly and necessarily subject to several statutory schemes, including the securities, tax and antitrust laws.  The Supreme Court in <u>Billing</u> was careful to caution that competing statutory schemes should be reconciled where possible, "rather than holding one completely ousted." 551 U.S. at 271.  While the IRS Regulations provide specific rules that govern the process by which tax-exempt municipal bond investments are priced and awarded, the IRS Regulations do not comprehensively regulate the municipal derivatives market, including the specific conduct at issue here. Violation of the IRS Regulations results in an investigation into arbitrage profits for the purposes of ordering tax penalties to be rebated to the Government.  IRS regulatory enforcement does not result in remedies for the underlying conduct alleged here, namely collusive bidding or price-fixing.  Further, as described above, the tax and antitrust laws do not conflict so as to blur what is forbidden from what is allowed -- both the tax laws and antitrust laws prohibit the collusive conduct in the municipal derivatives market as alleged in the SCAC.  Accordingly, the Court finds that the IRS Regulations do not implicitly preclude private enforcement of § 1.

### III. ORDER

For the reasons discussed above, it is hereby

**ORDERED** that the motion (Docket No. 484) of Wachovia Bank N.A.; Wells Fargo & Co., Inc.; Bear, Stearns & Co., Inc.; Natixis S.A.; JP Morgan Chase & Co.; Piper Jaffray & Co.; Société Générale SA; UBS AG; Morgan Stanley; National Westminster Bank PLC; Investment Management Advisory Group, Inc.; CDR Financial Products; Winters & Co. Advisors, LLC; George K. Baum & Co.; and Sound Capital Management, Inc. to dismiss the second consolidated amended class action complaint is DENIED; and it is further

**ORDERED** that the parties are directed to appear at a pretrial conference on April 30, 2010 at 1:30 p.m. and, in preparation for that conference, to confer and propose an agreed upon Case Management Plan in the form provided by the Court.

**SO ORDERED.**

Dated:     New York, New York
           25 March 2010

Victor Marrero
U.S.D.J.

USDS SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 3 - 2 5-10

-57-